JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

12 CIV 1253

-------------------------------------------------------x

KELLY DUNLOY,

                        Plaintiff,

        -against-

BGC FINANCIAL, L.P.,
JEAN-PIERRE AUBIN, COSME MONOT,

                    Defendants.

-------------------------------------------------------x

**COMPLAINT AND
JURY DEMAND**



FEB 17 2012
U.S.D.C. S.D.N.Y.
CASHIERS

       Plaintiff Kelly Dunloy, by and through her attorneys, Cuti Hecker Wang LLP, for

her Complaint alleges as follows:

### INTRODUCTION

    1.      Kelly Dunloy joined BGC Financial, L.P. ("BGC") – formerly Cantor

Fitzgerald – fresh with an honors degree from New York University, with the belief that she

could build a successful career as a broker.  She was both excited and determined to excel when

she arrived at BGC in June 2008, just one month after graduating.   This was her first job out of

college, and more than anything, she wanted to succeed and to advance.  She soon learned,

however, that to work as a woman at BGC meant that one had to endure constant demeaning and

derogatory remarks, and ultimately to be treated as nothing more than an object of sexual desire.

    2.      The quality of Ms. Dunloy's work and the merit of her contributions to BGC

took a distant second place to her colleagues' and supervisors' sexual desires and jokes.  The

environment was so profoundly poisonous and demeaning, and the misconduct was so

widespread and accepted – from the highest to the lowest levels – that Ms. Dunloy understood

the clear message: the only thing she could do was accept the behavior, do her best to try to gloss over or ignore it, and focus on her work.  Indeed, that approach was not only implicit based on how rampant and widespread the behavior was, but was also expressly communicated to her: when Ms. Dunloy expressed her profound disgust and anxiety about the atmosphere to someone at her desk, she was told to be sure not to put any complaint in writing, even through a casual note over email, because if she did, "Human Resources would have to get involved," and "no one wanted that."   Consistent with that warning, Ms. Dunloy later discovered that resorting to human resources resulted only in retaliation.

3.      The head of Ms. Dunloy's desk, Cosme Monot, a senior vice president who was close to the then-Executive Managing Director and Global Head, Listed Products of BGC, Jean-Pierre Aubin, routinely made comments about women's body parts and shouted "this is what it feels like to get raped by a trader" when talking about his work.  Eventually, after commenting repeatedly about other women on the floor, he began openly admiring Ms. Dunloy's breasts, expressing his desire to have sex with her, and referring to her as "Agent Shagwell."  No one seemed to think this behavior was out of place or inappropriate or that Monot should be reprimanded for it, including Mr. Aubin.

4.      Ms. Dunloy's emotional state gradually deteriorated as she tried to survive this hostile atmosphere.  Although she initially tried to change her behavior – for example by avoiding walking by certain desks on the floor where men were constantly making remarks about her – there was no escaping it, as Monot's behavior made clear.  Ms. Dunloy began suffering severe panic attacks while she was at work – suddenly gasping for breath on the floor in October 2008, when emergency services was called to her aide, and later hyperventilating at moments when she was not busy or preoccupied with the immediacy of completing a task.

5.        Shortly before concluding his employment at BGC, which ended for reasons unrelated to his treatment of Ms. Dunloy, Monot physically accosted Ms. Dunloy by grabbing her closely and putting his arms around her after stating once again that he wanted to have sex with her.  After this incident, Ms. Dunloy wrote an email expressing her concern about her situation and particularly Monot's behavior, to a person she had confided in earlier about harassment, Zachary Free.   After that written communication, Free told Ms. Dunloy that he had spoken to his own lawyers, and because he had been told that he could personally be liable, he instructed her to report to Human Resources.

6.        Although Ms. Dunloy ultimately followed Free's instructions, and the "Human Resources" department purportedly began an investigation, BGC undertook no genuine effort to remediate the overall atmosphere of BGC and failed to ensure Ms. Dunloy's protection from retaliatory acts.  Rather than assist Ms. Dunloy or remedy the hostile environment in which the women at BGC worked, Human Resources instead conducted a deeply flawed investigation that led to Ms. Dunloy being further ostracized and mistreated by her colleagues.  When Ms. Dunloy eventually retained counsel and attempted to find a safe way to return to work, BGC withheld her pay and ultimately fired her after she informed the company of her intention to file an EEOC charge (and later did file such a charge) describing the discrimination she endured.

7.        This action seeks to address the misogynistic and hostile environment that prevails at BGC and which BGC plainly appears to have no interest in meaningfully correcting or addressing.

**THE PARTIES**

8.        Plaintiff Kelly Dunloy resides in Manhattan.

9.        Defendant BGC Financial, L.P., formerly known as BGC Financial, Inc., is a multinational financial brokerage firm.  On information and belief, it is a limited partnership registered in Delaware with its principal place of business at One Seaport Plaza,19th Floor, New York, New York 10038.

10.        Defendant Jean-Pierre Aubin works out of BGC's New York office as the Global Head of Listed Products, and at all relevant times hereto was aware of and participated in the hostile environment.

11.        At all relevant times hereto, Defendant Cosme Monot worked in BGC's New York office as the head of the desk where Plaintiff worked.

**JURISDICTION AND VENUE**

12.        This action arises under 42 U.S.C. 2000e *et seq.*, Section 296 of New York's Executive Law, and New York Administrative Code § 8-107.

13.        The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1367(a), and the doctrine of supplemental jurisdiction.

14.        Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to Ms. Dunloy's claims occurred primarily in this district.

**JURY DEMAND**

15.        Plaintiff hereby demands a trial by jury.

## FACTUAL ALLEGATIONS

**Ms. Dunloy's Hiring**

16.     Kelly Dunloy became interested in pursuing a career in the financial services industry in part from learning about it through friends and at school, and in part based on conversations she had with an acquaintance, Zach Free, who worked at BGC.  Free suggested that Ms. Dunloy come and spend an afternoon or two on the desk where he worked to see if she was interested in working there as well.

17.     Ms. Dunloy visited and observed the Equity Derivatives Desk at BGC on two occasions before formally applying for a position.  On both occasions, she met Cosme Monot, the head of the desk, and spent approximately 45 minutes at the desk.  On neither occasion, however, was she interviewed, given work, or asked substantive questions about work or her relevant experience.

18.     During her first visit, Ms. Dunloy observed that there were only a handful of women who worked on the floor, which was arranged with open plan desks and seating.  Of the approximately 200 or so people who sat in the open plan, there were a total of perhaps ten women, including at least one secretary, and approximately four women who seemed to be in their 40's, 50's or 60's.   Ms. Dunloy also observed that upon her first visit to the floor, nearly all the men she passed turned and watched her as she walked passed them.

19.     Ms. Dunloy ultimately applied for and obtained a four-year contract at $70,000 per year to work at the Equity Derivatives Desk.  Ms. Dunloy was hired to support the Equity Derivatives Desk, and understood that she would be taking courses to pass the relevant tests for her broker's license and would eventually become a broker for the desk, which had eight male brokers at the time.

20.      In reality, from the very outset of Ms. Dunloy's first interactions with BGC –
even before her hiring – she was never evaluated as a potential employee with qualifications
relating to the work BGC does.  Instead, Ms. Dunloy was hired because of her supervisors' belief
that she was physically attractive and could serve as an object to be admired or desired and to be
trotted out in front of clients on social occasions.  She was hired only secondarily to conduct the
work of an assistant.

21.      One witness who heard Cosme Monot discuss Ms. Dunloy's hiring – and who
himself was called racist names by Monot and was then fired by BGC after he complained about
Monot's behavior – confirms that Monot chose to hire Ms. Dunloy because she was "so hot."
Jean-Pierre Aubin, Monot's superior, also approved of Ms. Dunloy's hiring only in the context
of exchanging emails with Free about how attractive she was.

**The Hostile Environment**

22.      Ms. Dunloy arrived at BGC with no inkling about the actual circumstances of
her hiring, and with every belief that she would be evaluated for her merits and with the intent of
undertaking all the tasks assigned to her to the best of her ability, and the intent of moving up the
chain and becoming a successful broker.

23.      She began on June 16, 2008, as the only woman and most junior person on the
desk.  She was tasked with assisting anyone on the desk in whatever they required of her – from
placing calls and creating paper confirmation tickets of trades, to creating spreadsheets.  She also
was responsible for getting everyone at the desk lunch, making dinner reservations, and filling
out expense forms for Monot, Free, and one other person.

24.      Ms. Dunloy's understanding was that as the most junior person on the desk,
she was required to do the most menial tasks, and she did her best to finish her work quickly and

accurately.  On information and belief, the most junior men at any desk on the 18th floor, including prior men in Ms. Dunloy's position at the Equity Derivatives Desk, were not asked routinely and regularly to get everyone lunch, make dinner reservations and/or fill out expense forms for others.

25.      Brokers at BGC did an enormous amount of socializing, often with clients, something Ms. Dunloy frequently had to arrange and often felt compelled to attend.  Ms. Dunloy was encouraged to attend these events, and was expressly and repeatedly told by Monot, Free, and another broker on the desk that she should bring her friends.  Sometimes, men on the floor or at her desk insisted that she bring a particular friend along whom they found attractive.

26.      From the start of her employment, Ms. Dunloy observed that, throughout the floor on which she worked, women were constantly being objectified and assessed by their body parts.  The following examples are representative of the types of remarks she observed and experienced throughout her time on the BGC floor:

    a.  When she walked through the open-plan floor, Ms. Dunloy often observed pictures of women in lingerie or bathing suits posted up on various brokers' computers, either because the brokers were surfing the web and looking at sites with such images, or in several cases, because they had cut out pictures and pasted them up over their workstations.

    b.  On a daily basis, Ms. Dunloy would hear brokers talk about women, their "tits," "asses" and other body parts, and the brokers' sexual exploits with those women.

    c.  One broker who was particularly loud sometimes screamed out at the top of his lungs "I LOVE SEX" so the whole floor could hear it, and often

made bed-rocking noises or talked about his sex life loudly and in great detail.

d.   At one point, the above-referenced broker began making comments about Ms. Dunloy's feet, commenting on how sexy they were and shouting "Kelly D, show me your feet!"  There were times when the broker did this on a daily basis and would start his chant in such a way that his entire desk would join in – all four men shouting "Kelly D, show me your feet!" at the tops of their lungs.  Again, people laughed and did nothing to stop this kind of behavior.  The broker would also call Ms. Dunloy "Sexy" instead of her name.  Though humiliated, Ms. Dunloy tried her best to smile and walk by, which she had to do in order to go to the cafeteria.  Eventually, however, Ms. Dunloy finally just stopped going to the cafeteria to avoid the route and walking by that desk.

27.   Although all of this behavior made Ms. Dunloy feel profoundly uncomfortable and anxious, it was evident that these types of conduct had long been the acceptable norm on the floor at BGC, and that to do anything other than simply trying to remain friendly and to focus on her work would only result in her own ostracization and possibly, the loss of her job.

**Cosme Monot's Behavior**

28.   The head of Ms. Dunloy's desk, Cosme Monot, epitomized all the worst aspects of this blatantly sexualized and misogynistic atmosphere at BGC.  The following examples are representative of Monot's behavior:

a. Monot would frequently discuss the body parts of a female broker with others at the desk, particularly when that broker walked by the desk to get water. He regularly referred to her as a "cougar," a slang term for a sexually aggressive woman. When Ms. Dunloy first arrived at BGC, this female broker worked at a neighboring desk focused on Credit Default. That desk was eventually moved to another floor. While she was stationed nearby, however, Monot would often talk about how much he "loved her ass," and would sometimes make a show of staring at her backside lasciviously. Even after her desk was moved upstairs, Monot would occasionally talk about the female broker's "ass."

b. Monot also commented frequently on the physical appearance of another woman – especially with respect to how she dressed. Ms. Dunloy heard Monot and Free specifically discussing this woman and talking about her breasts shortly after the woman first came in for an interview, before being hired in November for another desk. Monot made comments both directly to the woman, and to others on his desk. He also joined other brokers when they talked and speculated about the woman's sex life, and how she "must like three-somes."

c. Monot often sent electronic messages (in the form of instant messages, e-mails and/or Bloombergs) communicating with other brokers about his sexual desires and the physical attributes of women at BGC. Monot's comments were often made in Bloomberg chatrooms, where groups of brokers could read his comments in live time.

d.  Monot used sexualized, misogynistic images, even in the context of describing his own work.  He frequently invoked the image of a rape – if he felt that he had beaten someone in a trade or done something particularly well, he would, for example, pretend to give his microphone oral sex and scream out "This is how you get raped by a trader."  Other times he would refer to someone he didn't like by saying "I'm going to rape him" or "He's about to get raped."

29.     In late winter/early spring 2009, Ms. Dunloy realized that Monot regularly referred to her as "Agent Shagwell" to others, using the name for the fictional character in the film "Austin Powers: The Spy Who Shagged Me," who has sex with another character as part of her job as a secret agent.  Monot referred to Ms. Dunloy repeatedly over electronic communications as Agent Shagwell or "Shagwell."

30.     After her very first day of work, Ms. Dunloy was asked repeatedly by Free to come out and join himself, Cosme Monot and the Global Head of BGC, Jean-Pierre Aubin for dinner.  After overcoming her initial reluctance and surprise at receiving such an invitation as a new junior partner on the desk, Ms. Dunloy decided she would go, but with a friend so that she would feel a bit more comfortable.  During the dinner, Aubin asked Ms. Dunloy about her parents' wealth and asked her if she really needed to work at all or whether she was just doing this "for fun."   At one point during the evening, Monot turned to Ms. Dunloy's friend and said "In another life, I'd have liked to fuck you."

31.     On other occasions, Aubin observed Monot's and others' offensive behavior and never did anything about it, often only laughing at the behavior.

32.     In approximately October 2008, Free again texted Ms. Dunloy and asked her

to come join him and Monot at Cipriani's for dinner.  Though she was again reluctant, she eventually did join the two men.  This time, Monot turned directly to Ms. Dunloy and said bluntly, "I want to have boom boom with you."  He then went on to say "There, I finally admitted it directly to you.  I want to do boom boom with you."  Monot clearly used the term "boom boom" to mean sex.  He then went on to talk about Ms. Dunloy's breasts, saying that she had gorgeous "boobs" and that they "must have doubled in size" since Ms. Dunloy had joined BGC.  He went on to say that she "must be pregnant," because her "boobs are growing," and that if she was not pregnant, he would be happy to make her.  Free laughingly told Monot to stop, but did nothing further when Monot did not.

33.        From that moment onward, Monot constantly made remarks about Ms. Dunloy's breasts and how he "wanted" her, including at work in front of others on the desk as well as outside of work.  Though others, including Free, would observe these comments, they did nothing to stop him, and did nothing more than laugh.  Ms. Dunloy tried her best to continue her work, but also talked frequently to Free about how upset she was getting with Monot's behavior. Free told her that she shouldn't mind it and that Monot was just like that.  Although Free did tell a tearful Ms. Dunloy that he would talk to Monot about his behavior, it is unclear whether he did in fact do that.

34.        Monot's behavior was also retaliatory.  As Dunloy continued to try to ignore his comments, refusing to engage him when he made comments about her body or his desires, and certainly refusing to reciprocate any interest, Monot frequently became nasty and obnoxious, screaming at the top of his lungs for things that were not her fault or at most, minor errors.

35.        At the same time, Monot would alternate being "normal" with Ms. Dunloy, engaging in acceptable social banter and asking how she was or telling her about his family.

Ms. Dunloy did her best to continue to do her job, and to engage Monot when he was "normal" but refusing to respond when his tone became overtly sexual or obnoxious. Monot's conduct continued to exact an emotional toll, and Ms. Dunloy had more panic attacks and hyperventilated more frequently.

36.     Ultimately, on information and belief, Monot left BGC in approximately late February/early March 2009 for reasons completely unrelated to his treatment of Ms. Dunloy. Ms. Dunloy was directed to arrange for Monot's good-bye party, which she did.

37.     At the party, Monot commented that he was disappointed that Ms. Dunloy had worn a dress instead of jeans "because that dress makes me want to boom boom you." He then grabbed her closely and put his arms around her. Ms. Dunloy pushed him away and left the bar, crying.

38.     On Monday following the party, Ms. Dunloy returned to work and spoke at length with Free about how upset she was about her treatment by Monot. Free urged Ms. Dunloy to stay at home and expressly told her in sum or substance, "I'm legally supposed to report this, but let's try to keep this quiet, since Monot is gone." That evening, Ms. Dunloy wrote Free an email about how she was feeling – something he had earlier expressly directed her never to do.

39.     After that written communication, Free told Ms. Dunloy that her writing to him caused him to call his own lawyers, and because he had been told by his lawyer that he could personally be held liable, he instructed her to report to HR. Free said that it was because of the writing that she had to report to HR, and that if she did not, he would be forced to do it himself.

**Retaliation**

40.     Ms. Dunloy was interviewed by Rose Higgins of the Human Resources

Department and Andrew Kofsky, a counsel at BGC, on the Tuesday after Monot's goodbye

party.  After Ms. Dunloy tearfully recounted Monot's behavior, Higgins and Kofsky told her to

take a week off and informed her that they would investigate further.

41.     Although Ms. Dunloy was told that she would not suffer any retaliation for

her report, she immediately felt the repercussions of her complaint when she returned to work.

She was treated as a pariah.  Every person at her desk had been interviewed by Human

Resources, and many were obviously angry at her for reporting their friend and mentor, Monot.

All of the clients of the desk also seemed to know about Ms. Dunloy's complaint.

42.     Michael Ghoryeb, known as "MG," was particularly harsh, refusing to speak

with Ms. Dunloy for several days and then screaming at her after she had followed his directions

and done a spreadsheet precisely as he had told her to.  Not one person expressed any empathy or

sympathy to Ms. Dunloy.

43.     After about two weeks of enduring this behavior, Human Resources called

Ms. Dunloy in again and Higgins and Kofsky angrily "confronted" her with emails that they had

culled from her computer during which she had exchanged normal social banter with Monot,

including about his chateau in France, where he had been on vacation with his wife and children,

and during the course of which Ms. Dunloy at one point commented, in sum and substance, that

the chateau sounded lovely and she would like to visit.  BGC's representatives were plain in

asserting that it was Ms. Dunloy's fault that Monot had acted the way he had.

44.     Ms. Dunloy returned to her desk, continuing to feel like a pariah, and now at a

complete loss as to where to turn, since those who claimed to be "investigating" Monot seemed

instead to be investigating her.  Additionally, the taunts and shouts from other desks – "Kelly, show me your feet" and screams of "I LOVE SEX" – continued unabated.

45.     Although Ms. Dunloy had experienced panic attacks at work already due to the extraordinarily hostile environment in which she worked, her attacks only worsened and increased after the Human Resources Department became involved.  She began having attacks on a daily basis, with her throat constricting and a feeling that she could not breathe.

46.     The situation at work became impossible for Ms. Dunloy, as brokers at her desk continued to refuse to speak with her or act in any kind of friendly way as they had before. It was evident to Ms. Dunloy that she was not in a safe place.

47.     This feeling was only exacerbated by BGC, which failed to take any affirmative action to address her complaints, and in fact made matters worse by blaming her for the harassment and turning her colleagues against her.  This was magnified by the fact that Ms. Dunloy was required to return to the same desk at which she had faced egregious mistreatment by Monot.

48.     The impossibly sexualized and dangerous work environment effectively forced Ms. Dunloy to take a leave from BGC beginning in late March or early April of 2009 because of the panic attacks and other stress she suffered while at work.

49.     After being forced out of BGC, Ms. Dunloy, through counsel, repeatedly informed BGC that she suffered panic attacks because she felt unsafe at BGC and that she could not return to work at BGC's hostile environment.  Per BGC's requests, Ms. Dunloy also provided letters confirming that as a result of Ms. Dunloy's traumatic experience at BGC, she was unable to return to work, and that it was not possible to ascertain when Ms. Dunloy would be able to return to work.

50.      After sending the documentation requested by BGC and attempting for months to ascertain Ms. Dunloy's status at the company and how her complaints were being addressed, Ms. Dunloy's counsel wrote to Andrew Kofsky of BGC on October 23, 2009, and informed him of Ms. Dunloy's intent to file a charge with the EEOC given the utter silence from the company.  Counsel attached a copy of Ms. Dunloy's EEOC charge to that communication.

51.      On October 28, 2009, Ms. Dunloy filed a charge with the EEOC describing the pervasive sexual harassment and animus she faced while working at BGC.

52.      BGC responded to Ms. Dunloy's communication about filing the EEOC charge by swiftly retaliating and removing Ms. Dunloy from its payroll – an apparent attempt to terminate her.  Ms. Dunloy was not given prior notice or any explanation for BGC's actions; she first learned of BGC's decision to remove her from the payroll when she failed to receive a paycheck as scheduled on November 15, 2009.  Nothing had changed in regard to Ms. Dunloy's status prior to this action by BGC, other than her informing BGC of her intention to assert her rights and seek the assistance of the EEOC.

53.      BGC failed to pay Ms. Dunloy for the November 1-November 15, 2009 pay period.  But after Ms. Dunloy's counsel pointed out that Ms. Dunloy had been removed from the payroll without notice, and that it had been done moments after she had engaged in protected activity – namely, stating her intention to file an EEOC charge and actually filing the charge – BGC suddenly restored Ms. Dunloy to its payroll for the next pay period.  BGC never compensated her for the missing pay cycle, nor did it even attempt to explain why Ms. Dunloy had been removed in the first place.

54.      On March 15, 2010, a normal pay period, BGC once again removed Ms. Dunloy from the payroll without notice.  Only after her counsel requested an explanation for

BGC's actions did Ms. Dunloy receive a letter, dated March 18, 2010, stating that her paid leave of absence had been discontinued, effective immediately, and that she had been discharged.  At the time this occurred, BGC was well aware that Ms. Dunloy felt unsafe at BGC, and that the hostile atmosphere at BGC had profoundly damaged Ms. Dunloy's mental and physical health. Nonetheless, BGC never offered Ms. Dunloy any indication that it took her complaints seriously, or that it had taken any measures to address them.

55.     On January 27, 2012, after exhausting her administrative remedies and fewer than ninety days before her filing of this Complaint, Ms. Dunloy received a Notice of Right to Sue letter from the EEOC.

56.     As a result of BGC's pervasively hostile and sexist work environment, failure to halt Monot's direct sexual harassment of Ms. Dunloy, and retaliation against Ms. Dunloy when she complained to human resources and filed a charge with the EEOC, Ms. Dunloy has suffered substantial emotional and economic damages.

**FIRST CAUSE OF ACTION**
Against Defendant BGC Financial, L.P.
(Unlawful Discrimination - Title VII, 42 U.S.C. § 2000e *et seq.*)

57.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

58.     BGC is an employer as defined in Title VII, and at all relevant times herein, employed Ms. Dunloy.

59.     At all relevant times herein, defendant BGC discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII, including without limitation by allowing for, encouraging and condoning: a sexually hostile, demeaning, degrading and abusive work environment; the disparate treatment and degradation of

16

female staff; *quid pro quo* discrimination, which required Ms. Dunloy to accept unwanted sexual advances, questions, and comments, especially from her supervisor Cosme Monot, as a condition of her continued employment; and/or other acts as detailed above.

60.     As a result of BGC's sexual harassment and sex discrimination, Plaintiff has been damaged and is entitled to compensatory damages, plus costs and attorneys' fees, and is further entitled to punitive damages.

## SECOND CAUSE OF ACTION
Against All Defendants
(Unlawful Discrimination - New York Executive Law)

61.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

62.     At all times relevant hereto, Defendant BGC had at least four persons in its employ and therefore its agents and employees were required to comply with the Civil Rights Laws of the State of New York, including New York Executive Law § 296.

63.     New York Executive Law § 296(1)(a) prohibits employers from discriminating against an employee because of sex "in compensation or in terms, conditions or privileges of employment."

64.      The foregoing acts and practices of defendant constitute unlawful discriminatory employment practices within the meaning of and in violation of Section 296 of the New York State Executive Law.

65.      As a result of Defendants' sexual harassment and sex discrimination against Plaintiff, including by allowing and permitting, and participating in a misogynistic, sexualized atmosphere, and ensuring that Monot could engage in his sexual advances and harassment of her, Ms. Dunloy has suffered and continues to suffer damages including, but not limited to lost

income, lost future earnings, mental anguish, and embarrassment.

### THIRD CAUSE OF ACTION
Against All Defendants
(Unlawful Discrimination - New York City Administrative Code)

66.         Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

67.         Plaintiff is an aggrieved person under New York City Administrative Code § 8-502(a).

68.         At all times relevant to this Complaint, Defendant BGC was an "employer" within the meaning of New York City Administrative Code § 8-102, employing at least four persons.

69.         New York City Administrative Code § 8-107(1)(a) makes it unlawful for an "employer or an employee or agent thereof, because of the . . . gender . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

70.         BGC discriminated against Ms. Dunloy in her compensation and in the terms, conditions or privileges of her employment by requiring her to perform menial and degrading tasks not required of men at her desk, including, upon information and belief, men who previously served in her position.

71.         Defendants – through the repeated unwanted sexual advances and comments of Cosme Monot and other employees on Ms. Dunloy's floor  – maintained a sexually hostile work environment which altered the terms, conditions or privileges of Ms. Dunloy's employment in violation of New York City Administrative Code § 8-107(1)(a).  Moreover, Monot's *quid pro*

*quo* sexual demands also violated that provision.  Aubin furthered and participated in the hostile environment and participated in the treatment of Ms. Dunloy as an object of sexual desire.

72.     Defendants are liable for the discriminatory and humiliating environment in which Ms. Dunloy worked, because it was created and fostered by Monot, Aubin and other BGC management, because Defendants did not take adequate steps to prevent or address discrimination, and/or because Ms. Dunloy's direct supervisor was a perpetrator.

73.     Pursuant to New York City Administrative Code § 8-502(c), Plaintiff will serve a copy of this complaint within ten days of commencing the action upon the City Commission on Human Rights and Corporation Counsel.

74.     Defendants conduct was willful, intentional and made in disregard for the rights of others.

75.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained damages alleged herein.

76.     Accordingly, under the New York City Administrative Code § 8-502(a) and (f), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### Against Defendant BGC Financial L.P.
### (Retaliation - Title VII, 42 U.S.C. § 2000e *et seq.*)

77.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

78.     When Ms. Dunloy reported to Human Resources and legal counsel at BGC that she had been the victim of sexual harassment, she immediately felt the repercussions of her complaints when she returned to work and was treated as a pariah and subjected to harsh and

humiliating treatment by the men at her desk and others on her trading floor.

79.     Ms. Dunloy was subjected to further retribution when she informed BGC, through counsel, of her intent to file a charge with the EEOC, and when she filed that charge. Ms. Dunloy's pay was immediately suspended and two weeks of pay was never reimbursed, and she was ultimately terminated by the company without notice or explanation.

80.     This retaliation and abuse adversely and severely impacted Ms. Dunloy's position, career and well-being, and was designed to punish and retaliate against her for having complained about the humiliating and frightening treatment she was forced to endure.

81.     As a result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has suffered actual damages as a result of lost income and emotional harm, and she is entitled to compensatory damages, plus costs and attorneys' fees, and further, to punitive damages.

## FIFTH CAUSE OF ACTION
### Against All Defendants
### (Retaliation - New York Executive Law)

82.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

83.     New York Executive Law § 296(7) makes it unlawful to retaliate "against any person because he or she has opposed any practices forbidden under this article."

84.     Ms. Dunloy's refusal to consent to Cosme Monot's sexual advances, her complaints to Zach Free, her complaints to Human Resources and legal counsel, and her subsequent communications with BGC's counsel and filing of a charge with the EEOC, all constituted protected activities.

85.      Defendants punished Ms. Dunloy for these activities by provoking and condoning harsh retaliation by Ms. Dunloy's colleagues and by suddenly suspending Ms.

Dunloy's pay and ultimately firing her.  Monot engaged in direct retaliation by punishing Ms.

Dunloy each time she refused to accede to his harassment and sexual advances and when she

complained to Zach Free, including by screaming at her and imposing unreasonable work and

work conditions on her.

86.     The foregoing acts and practices of Defendants constitute unlawful retaliatory

employment practices within the meaning of and in violation of Section 296 of the New York

State Executive Law.

87.      As a result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has

suffered and continues to suffer actual damages including but not limited to lost income, lost

future earnings, mental anguish, and embarrassment.

### SIXTH CAUSE OF ACTION
Against All Defendants
(Retaliation – New York City Administrative Code)

88.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were

fully set forth at length herein.

89.     New York City Administrative Code § 8-107(8) makes it unlawful for "any

person engaged in any activity to which this chapter applies to retaliate or discriminate in any

manner against any person because such person had . . . opposed any practice forbidden under

this chapter."

90.     The foregoing acts and practices of Defendants constitute unlawful

discriminatory and retaliatory employment practices within the meaning of and in violation of

Section 8-107(7) of Title 8 of the New York City Administrative Code.

91.     Defendants are liable for their retaliation against Ms. Dunloy because they

created and fostered an environment in which management at BGC took no meaningful steps to

prevent or address the mistreatment Ms. Dunloy faced after complaining to Human Resources and because they withheld pay and ultimately fired Ms. Dunloy after she filed a charge with the EEOC.   Monot engaged in direct retaliation by punishing Ms. Dunloy each time she refused to accede to his harassment and sexual advances and when she complained to Zach Free, including by screaming at her and imposing unreasonable work and work conditions on her.

92.     Pursuant to New York City Administrative Code § 8-502(c), Plaintiff will serve a copy of this complaint within ten days of commencing the action upon the City Commission on Human Rights and Corporation Counsel.

93.     Defendants' conduct was willful, intentional and made in disregard for the rights of others.

94.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained damages alleged herein.

95.     Accordingly, under New York City Administrative Code § 8-502(a) and (f), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.s

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered against the Defendants as follows:

a.      Ordering Defendants to pay compensatory damages in an amount to be determined at trial;

b.      Ordering Defendants to pay punitive damages in an amount to be determined at trial;

c.      Ordering Defendants to pay reasonable attorneys' fees, disbursements, costs and pre- and post-judgment interest; and

d.      Awarding such other and further relief, as the Court may deem just and proper.

Dated: New York, New York
      February 17, 2012

CUTI HECKER WANG LLP

By:_____
     Mariann Meier Wang
     Alexander Goldenberg

305 Broadway, Suite 607
New York, New York 10007
(212) 620-2603

*Attorneys for Plaintiff Kelly Dunloy*